FILED_____ ENTERED
LOGGED_____ RECEIVED

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

MAR 3 1 2026

AT BALTIMORE
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _____ DEPUTY

|  |  |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH rdepol@aerovanti.com (**TARGET ACCOUNT #1**) and pbh@aerovanti.com (**TARGET ACCOUNT #2**) STORED ON AN ELECTRONIC MEDIA DEVICE IN THE CUSTODY OF THE UNITED STATES LOCATED IN THE DISTRICT OF MARYLAND | Case No. 1:26-mj-00554-ADC _____ |

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, CHARLES BRADFORD, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION

1.      I make this affidavit in support of an application for a search warrant under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the search of information associated with Microsoft email accounts rdepol@aerovanti.com (**TARGET ACCOUNT #1**) and pbh@aerovanti.com (**TARGET ACCOUNT #2**) stored on an electronic media device in the custody of the United States in the District of Maryland.  The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant to locate and seize the items described in Attachment B.

2.      On July 12, 2024, the Honorable J. Mark Coulson, United States Magistrate Judge for the District of Maryland, authorized a warrant pursuant to 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Microsoft Corporation ("Microsoft") to disclose to the government information associated with **TARGET ACCOUNT #1** and **TARGET**

ACCOUNT #2. *See* 1:24-mj-01704 (attached as Exhibit A) (hereafter referred to as the "prior warrant").

3. On or about July 15, 2024, the Government served the prior warrant on Microsoft. On or about November 5, 2024, Microsoft produced to the Government certain returns responsive to the warrant. Microsoft provided a cover letter with the production that indicated the following: "Microsoft has received your legal demand for the account(s) rdepol@aerovanti.com and pbh@aerovanti.com and has provided data for the following services, if any such data exists: MSA, Email." *See* Exhibit B. The cover letter further explained: "Microsoft has conducted a reasonable and diligent search for the records requested in the attached legal request. All available records that are responsive to your legal demand are included in this production." *Id.*

4. The production from Microsoft contained limited documents associated with the rdepol@aerovanti.com account. Based on that limited production and Microsoft's representations, the Government believed that Microsoft did not have the emails associated with **TARGET ACCOUNT #1** and **TARGET ACCOUNT #2** and that they were unattainable.

5. On May 8, 2025, a grand jury in the District of Maryland returned two indictments charging Patrick Britton-Harr ("Britton-Harr") in separate health care fraud and wire fraud schemes. *See* 25-cr-143-ABA; 25-cr-144-ABA. The indictment charging wire fraud related to the fraudulent scheme described below. Soon after Britton-Harr's initial appearance in this District, the Government produced voluminous discovery to the Defense, including the limited returns provided by Microsoft in response to the prior warrant.

6. On February 25, 2026, and in preparation for trial scheduled for May 18, 2026, the Government communicated with a representative for Microsoft in an effort to further

2

understand the limited nature of the prior production. Microsoft subsequently informed the Government that it had erred and failed to produce approximately 305,000 items in response to the prior warrant. Microsoft explained that it had previously searched for and collected the responsive data, but neglected to produce it to the Government in response to the prior warrant.

7.      From on or about February 25, 2026, through on or about March 4, 2026, Microsoft attempted to produce to the Government, via Microsoft's the law enforcement portal, the information associated with **TARGET ACCOUNT #1** and **TARGET ACCOUNT #2** responsive to the prior warrant. Microsoft made multiple attempts to produce the data but the Government was unable to download them because of technical issues with the Microsoft portal.

8.      On or about March 4, 2026, Microsoft successfully produced the associated with **TARGET ACCOUNT #1** and **TARGET ACCOUNT #2** responsive to the prior warrant and the Government downloaded the data to an electronic media device, currently located in the District of Maryland.

9.      Despite my belief that the Government's review of the information associated with **TARGET ACCOUNT #1** and **TARGET ACCOUNT #2** under the prior warrant would be reasonable due to Microsoft's error, I nevertheless seek a new warrant authorizing such a review out of an abundance of caution.

10.     This affidavit is intended to show that there is sufficient evidence to establish probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

11.     Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. §§ 1343 (wire fraud), and 1956 and 1957 (money laundering), hereafter the "target offenses," have been committed by Patrick

3

Britton-Harr. There is also probable cause to search the information described in Attachment A for evidence, instrumentalities, contraband, and/or fruits of these crimes further described in Attachment B.

## AGENT BACKGROUND

12.    I am a Special Agent with the Department of Transportation – Office of Inspector General ("USDOT-OIG") and have been since roughly March 2018.

13.    As a Special Agent of the US DOT-OIG, I have been involved in executing search warrants, and conducting investigations involving false claims, false statements, wire fraud and other crimes under the jurisdiction of the Federal Aviation Administration ("FAA"), an agency of United States Department of Transportation. I have knowledge of FAA regulations and requirements regarding air carriers and operators. Before becoming a Special Agent, I was employed as a Management and Program Analyst for the USDOT-OIG in the acquisition and procurement audit group. Before my employment at USDOT-OIG, I was employed as a Criminal Intelligence Analyst for Baltimore County Police Department. In addition, I graduated with honors from Towson University with a Bachelor of Science degree.

## PROBABLE CAUSE

14.    Special Agents of the USDOT-OIG and the Federal Bureau of Investigation (FBI) have and continue to investigate the activities of Patrick Britton-Harr ("Britton-Harr"), Robert De Pol ("De Pol")[1], and others associated with Aerovanti, Inc., Aerovanti Aviation, LLC,

---

[1] At the time that the government submitted the prior search warrant, investigators had reason to believe that De Pol was a co-conspirator in the scheme to defraud. However, further investigation led investigators to believe that De Pol was not a knowing participant in the scheme to defraud.

Aerovanti Aircraft, LLC, Aerovanti Brokerage, LLC, and Aerovanti Yacht Club, LLC, collectively referenced hereafter as "Aerovanti" unless specified otherwise.

15. The information set forth below to establish probable cause is based, in part, on information obtained from potential victims of and witnesses of the alleged fraud detailed herein. Each such individual will be referred to as a cooperating witness or "CW." These CWs will be assigned a number in order to differentiate them. They will also be referred to as masculine regardless of their actual gender.

16. This affidavit will first set forth Britton-Harr and Aerovanti's acquisition of, and relationship to, five aircraft that are relevant to the alleged scheme. Next, this affidavit will describe the execution of the alleged scheme.

### Summary of Allegations Against Britton-Harr and Aerovanti

17. Aerovanti and its affiliated entities were founded in 2021 and offered low-cost private air travel services. Britton-Harr was the founder and chief executive officer. De Pol was chief operating officer. Between the end of 2021 and the first half of 2022, Britton-Harr entered into an agreement with two Aerovanti members – CW-6 and CW-7. They agreed that CW-6 and CW-7 would help them recruit new members as part of Aerovanti's "Top Gun" Program. The purpose of the program was to use membership fees to purchase aircraft debt-free while offering a pre-set number of flight hours to members aboard Aerovanti's planes, including the aircraft their money helped purchase. Top Gun members recruited by CW-6 and CW-7 were organized into five LLCs of 20 individual members, each contributing $150,000 for a total of approximately $3,000,000 per LLC. The money was held in escrow and eligible for disbursement to Aerovanti to purchase and refurbish a pre-selected aircraft. Since Aerovanti was a start-up company, CW-6 and CW-7 insisted, and Britton-Harr agreed, that the LLC would hold

5

the title to the aircraft in escrow until its individual members had used the majority of their collective flight hours. This was meant as a security for the members, i.e., if Aerovanti collapsed or failed to perform as promised, the LLC could recover some of its members' expenses by selling the aircrafts they helped purchase.

18. Between April and October 2022, Britton-Harr caused 28 disbursements of Top Gun member funds from the escrow account to accounts controlled by Aerovanti, totaling at least $14,300,000. Britton-Harr claimed this money was needed to purchase and obtain title to five Piaggio aircraft, but this was a lie. None of the members' money was used to buy aircraft. Instead, Britton-Harr misappropriated millions of dollars of their members' money, funneled it between accounts, and used it to fund his lifestyle, purchase yachts, conduct real estate transactions, and for other unauthorized and undisclosed purposes.

19. The facts set forth below will show there is probable cause to believe Britton-Harr used pbh@aerovanti.com (**TARGET ACCOUNT #2**) to commit the target offenses and that those accounts contain evidence of the target offenses. As set forth below, there is also probable cause to believe that evidence of the target offenses will be contained within De Pol's email account, rdepol@aerovanti.com (**TARGET ACCOUNT #1**).

### *The Target Accounts: Subscriber Information*

20. According to information provided by Microsoft, **TARGET ACCOUNT #1** was assigned to Robert De Pol.

21. According to information provided by Microsoft, **TARGET ACCOUNT #2** was assigned to Patrick Britton-Harr.

22. On March 18, 2024, the Honorable Adam Abelson, then United States Magistrate Judge for the District of Maryland, signed an order pursuant to 18 U.S.C. § 2703(d) compelling

Microsoft to produce certain records to the investigative case team, including non-content user activity for both **TARGET ACCOUNT #1** and **TARGET ACCOUNT #2**. Those records show that **TARGET ACCOUNT #1** and **TARGET ACCOUNT #2** communicated with one another and suspected victims throughout 2022 and during the execution of the alleged scheme.

## Background

### *Britton-Harr and Aerovanti Obtain Lease-Purchase Agreements on Five Piaggio Aircraft*

23.    Aerovanti advertised itself to customers as a low-cost private aviation service. Its competitive pricing was partially based on its use of the Piaggio P-180 Avanti aircraft, which Aerovanti claimed had lower maintenance costs and equivalent range and amenities as some of its competitor aircraft. Britton-Harr sought to obtain several such aircraft to add to Aerovanti's fleet. Britton-Harr encouraged new and existing members to purchase Piaggio aircraft to lease back to Aerovanti through lease-purchase agreements. Several members and groups of members did so and established LLCs to purchase and own the aircraft during the lease-purchase agreements. The aircraft will be referenced herein by their FAA special registration numbers, which are alphanumeric sequences beginning with the letter "N." The following briefly describes the acquisition of five such aircraft.

### N111VR and N189LW

24.    A group of Aerovanti members collectively referred to as Member Group-1 purchased two Piaggio aircraft in 2021 at Britton-Harr's urging. Those aircraft bore FAA registration numbers N111VR and N189LW. On November 4, 2021, Member Group-1 executed a lease-purchase agreement with Aerovanti, which Britton-Harr digitally signed on Aerovanti's behalf. Under the agreement, Aerovanti agreed to pay Member Group-1 approximately $24,232.13 per month for 48 months. At the conclusion of this lease period, Aerovanti agreed to

pay Member Group-1 a final "balloon" payment of approximately $1,914,082.20, after which ownership of the aircraft would pass to Aerovanti.

25. According to a member of Member Group-1, hereafter referred to as CW-1, N189LW was airworthy at the time of its purchase, whereas N111VR was not and was mainly purchased for its parts. According to CW-1, neither Aerovanti nor Britton-Harr ever purchased N111VR or N189LW from Member Group-1. CW-1 later learned that Aerovanti mechanics cannibalized parts from N111VR and N189LW and used them on other aircraft.

26. On or about March 22, 2023, Member Group-1 filed a civil lawsuit against Aerovanti Aircraft LLC (and others) in Broward County, Florida, alleging breach of contract for failing to make the required lease payments and seeking repossession of N111VR and N189LW.

**N290BC**

27. The investigative team interviewed CW-2, who became an Aerovanti member in 2021. Britton-Harr encouraged CW-2 to purchase an aircraft and lease it back to Aerovanti to secure better pricing and more reliable flight service.

28. CW-2 purchased N290BC through his business, hereafter referred to as Member Group-2. On or about November 18, 2021, CW-2 and Britton-Harr executed a lease purchase agreement for N290BC on behalf of Aerovanti and Member Group-2, respectively. Under the agreement, Aerovanti agreed to pay Member Group-2 approximately $25,000 per month for 48 months. At the conclusion of this period, Aerovanti agreed to pay Member Group-2 a final "balloon payment" of approximately $200,000, after which ownership of the aircraft would pass to Aerovanti. The agreement also required Aerovanti to operationally maintain and to acquire insurance for N290BC. CW-2 discovered that Aerovanti was not maintaining the aircraft or

8

maintaining sufficient insurance. CW-2 asked Britton-Harr to provide the maintenance records for N290BC. Britton-Harr refused.

29.    At some point in 2022, Member Group-2 filed a civil lawsuit against Aerovanti Aircraft LLC., in Sarasota County, Florida, alleging breach of contract, wrongful detention of records, and sought to repossess N290BC.

30.    Aerovanti did not purchase N290BC until on or about April 14, 2023. Aerovanti's purchase of N290BC from Member Group-2 was accomplished through a loan of approximately $1,500,000 from a lender hereafter referred to as Lender-1.[2]

**N1037W**

31.    The investigative team interviewed CW-3, who reported that he became an Aerovanti member sometime in late 2021 / early 2022. At Britton-Harr's urging, CW-3 decided to purchase a Piaggio aircraft and lease it to Aerovanti.

32.    CW-3 formed Member Group-3 to purchase N1037W. Then, on or about January 17, 2022, Member Group-3 entered into a lease-purchase agreement with Aerovanti. CW-3 and Britton-Harr executed the agreement on behalf of Member Group-3 and Aerovanti, respectively. Under the lease-purchase agreement, Aerovanti agreed, *inter alia*, to pay Member Group-3 approximately $25,000 per month for 48 months. At the conclusion of this period, Aerovanti agreed to pay Member Group-3 a final "balloon payment" of approximately $2,100,000 after which ownership of N1037W would pass to Aerovanti.

---

[2] On or about October 25, 2023, Lender-1 filed a civil lawsuit against Aerovanti Inc., and Aerovanti Aircraft, LLC., in Sarasota County, Florida, in which it alleged *inter alia* that Aerovanti had failed to make any of the required payments under the loan agreement and associated promissory note.

33.    On or about July 3, 2023, Member Group-3 filed a lawsuit against Aerovanti Aircraft, LLC. in Manatee County, Florida, seeking repossession of N1037W, alleging breach of contract for failing to make required payments, and seeking a temporary injunction against Aerovanti Aircraft, LLC. prohibiting it from transferring N1037W's engines to any other aircraft.

34.    Neither Britton-Harr nor any Aerovanti entity or employee ever purchased N1037W. CW-3 further stated his understanding that N1037W was inoperable from March 2022 to March 2023.

### N2444Z

35.    The investigation team interviewed CW-4 and CW-5, who were not Aerovanti members. Instead, they were a married couple who operated a real estate and asset broker business. Their non-real estate assets included aircraft and race cars. CW-4 and 5 purchased N2444Z and imported it from Europe to Massachusetts in July 2020. Britton-Harr and CW-4 entered into a lease-purchase agreement for N2444Z. CW-4 recalled that the agreement required Aerovanti to pay him approximately $25,000 per month. He further recalled that Britton-Harr and Aerovanti were often delinquent on the lease payments and that CW-4 threatened to repossess the airplane on several occasions.

36.    CW-4 explained that Britton-Harr eventually purchased N2444Z from him before the lease period ended.

37.    The investigative case team obtained documents related to N2444Z from the FAA. Among them were aircraft registration documents. Attached to these was the original lease-purchase agreement between CW-4 and 5 and Aerovanti. CW-4 and Britton-Harr executed the agreement on or about November 3, 2021. The agreement required Aerovanti to make an

10

initial payment to CW-4's company of approximately $230,000 and thereafter pay CW-4's company approximately $30,000 per month for 24 months. At the end of this period, the agreement called for Aerovanti to make a final "balloon payment" of approximately $5,000, at which point ownership of the aircraft would transfer to Aerovanti.

38.    Documents obtained from the FAA further revealed that CW-4 and Aerovanti agreed to terminate the lease on or about September 13, 2022, and that Britton-Harr executed an aircraft registration application for N2444Z that same day.

### The Scheme

#### *CW6, CW7 and the Recruitment of New Members to Purchase Aircraft*

39.    The investigative team interviewed CW-6 and CW-7. In late 2021, CW-6 discovered Aerovanti while searching for private jet services on the internet. He sent a request for information and, on or about November 22, 2021, was contacted by De Pol, who used **TARGET ACCOUNT #1**. CW-6 and De Pol exchanged emails about Aerovanti's membership program. CW-6 eventually contacted CW-7, who was CW-6's friend and someone who CW-6 knew was also interested in obtaining private aviation services.[3]

40.    On or about November 26, 2021, Britton-Harr used **TARGET ACCOUNT #2** to email CW-6 to discuss Aerovanti's membership options.

41.    On or about November 28, 2021, CW-6 sent an email to CW-7, De Pol (at **TARGET ACCOUNT #1**) and Britton-Harr (at **TARGET ACCOUNT #2**) to discuss additional membership options and to set up a time to meet in person.

---

[3] CW-6 and CW-7 have a pending lawsuit against Britton-Harr, Aerovanti, and others in Montgomery County, Maryland alleging various frauds.

11

42. CW-7 eventually met Britton-Harr in person at an aircraft hangar in Easton, Maryland. They discussed Aerovanti's business and CW-7 was treated to a flight aboard a Piaggio aircraft.

43. CW-6 and 7 eventually agreed to become members, but continued to negotiate with Britton-Harr and De Pol about the terms under which they would join.

44. On or about February 6, 2022, De Pol used **TARGET ACCOUNT #1** to email CW-6 and Britton-Harr (at **TARGET ACCOUNT #2**) inviting CW-6 and CW-7 to purchase aircraft. Specifically, De Pol wrote "[p]urchasing an airplane would give you the ability to depreciate the asset for 2022 and we would structure the lease purchase agreement to lease it back from you for $20-25k per month over 4 years with a balloon at the end, with the hopes that you would go out and buy another one."

45. On or about February 9, 2022, Britton-Harr used **TARGET ACCOUNT #2** to email CW-6, CW-7, and De Pol (at **TARGET ACCOUNT #1**) to provide CW-6 and CW-7 more information about the aircraft he and De Pol were encouraging them to buy. Britton-Harr wrote "Gents, as a teaser, Please see below aircrafts. The Purchase price of $5MM plus tax etc. is for 2 airplanes as a package." Britton-Harr sent photos of the aircraft and identified them as N189LW and N111VR. As stated above, these aircraft were owned by Member Group-1 and subject to lease purchase agreements that were executed on November 4, 2021.

46. CW-6 and CW-7 eventually informed Britton-Harr and De Pol that they were not interested in purchasing airplanes. Instead, they offered to recruit their friends and acquaintances to become members and use their pooled membership fees to purchase the aircraft debt-free.

12

47.    According to CW-6 and CW-7, they requested that the members' money be held in escrow and that the members be offered a security interest in the aircraft – that is, title to the aircraft – that their money was used to purchase.

48.    On or about February 24, 2022, Britton-Harr used **TARGET ACCOUNT #2** to send an email to CW-6, CW-7, and De Pol (at **TARGET ACCOUNT #1**). Specifically, he wrote, "I agree, an escrow arrangement where funds are fully collected and held for each aircraft acquisition group is best. Funds can be released at the time of closing and lien being filed." In the same email he also proposed the following terms: "1) Establish LLC (~20 Member Units) & Draft Owner Addendum to LLC Member Agreement; 2) Each Member Unit = 100hrs @ $1500hr ($150,000 Block purchase * ~20 = $3MM); 3) Set up and fund Escrow; 4) AeroVanti identify aircraft & purchase aircraft; 5) Place LLC Lien on aircraft at closing; 6) Issue Stock Warrant at Closing to LLC; 7) Start Flying[.]"

49.    On or about March 27, 2022, CW-6 emailed a large list of prospective members. CW-6 carbon copied CW-7 and De Pol (at **TARGET ACCOUNT #1**) and attached the membership agreements and information about the company. Summarizing the terms, CW-6 wrote that Aerovanti was offering a 100-hour block purchase of pre-paid flight time for a total of $150,000 per member. He further wrote that the funds would be "utilized to purchase new aircraft for AeroVanti's growing fleet (currently at 7 airplanes)[.]" CW-6 further wrote that "Title to each reconditioned, debt-free airplane will be held in escrow pending AeroVanti's performance of the membership obligations under block time purchase agreement." In his concluding paragraph, CW-6 wrote "AeroVanti is seeking to acquire 4-5 new planes quickly. [CW-7] and I are both purchasing a unit individually in this offering because the flight hour rate

13

is compelling, and our funds will have some measure of security since the airplane title will be held in escrow."

50. On March 28, 2022, CW-7 sent this same email to a separate list of prospective new members. Again, CW-6 and De Pol (at **TARGET ACCOUNT #1**) were carbon copied. CW-7 also attached the membership agreement and information about the company to his email.

51. Before CW-6 and 7 sent these recruitment emails, CW-6 asked De Pol, in an email to **TARGET ACCOUNT #1**, to proofread the terms, conditions, and representations he planned to make. De Pol offered no changes to the email.

*The LLCs and the LLC Agreements*

52. Britton-Harr agreed that new members recruited by CW-6 and CW-7 would be organized into LLCs that would be used to acquire aircraft without incurring a debt. To that end, they formed LLCs in Maryland. CW-7 was the agent and representative for each LLC. They also agreed that money contributed by the new members would be held by an escrow agent in Oklahoma. The LLCs were named according to the FAA tail number associated with the aircraft its members' funds would be used to purchase. The table below shows certain relevant information about these LLCs.

| LLC Name | Associated Aircraft | Date of Formation |
|---|---|---|
| 44Z, LLC. | N2444Z | 3/30/2022 |
| 90BC, LLC. | N290BC | 5/9/2022 |
| N189LW, LLC. | N189LW | 6/15/2022 |
| N1037W, LLC. | N1037W | 8/19/2022 |
| N111VR, LLC. | N111VR | 8/25/2022 |

53.    The LLCs each entered into agreements with Aerovanti. The agreements outlined the obligations of the parties and their relationship to the individual members. Critically, the agreements described the LLC's purpose, the circumstances and methods by which the LLC's escrowed funds could be released to Aerovanti, and the maintenance of the aircraft's title while the contract with the LLC was being fulfilled by Aerovanti. The terms of each agreement were the same.

54.    The parties agreed in paragraph 1(d) of the agreement that the escrowed funds of the LLC could be released to Aerovanti for only three purposes: 1) to purchase the relevant aircraft; 2) to refurbish that aircraft up to defined FAA standards; and 3) to otherwise pay for the members' use of aircraft. CW-6 and CW-7 explained that they understood "use of aircraft" to cover third-party charter services for members while the aircraft the LLC intended to own was being purchased and/or refurbished.

55.    In paragraph 1(d)(i) the parties agreed that Aerovanti would provide a written certification, approved by the member (the LLC), to the escrow agent stating Aerovanti had entered into an aircraft purchase agreement for the relevant aircraft, at which point the escrowed funds would be released to Aerovanti.

56.    In paragraph 2(c) the parties agreed that Aerovanti would endorse and deliver to the escrow agent the title to the relevant aircraft.

57.    In paragraph 2(e) the parties agreed that the title would remain in escrow on behalf of the LLC until its block time hours were less than 300 or at the conclusion of the agreement's term, whichever was earlier.

58.    CW-6 and CW-7 both explained that possession of the aircraft's title was critical to the deal. CW-6 and CW-7 both stated that they would not have recruited new members without this security for their money.

### *Aircraft Do Not Have Titles*

59.    Through my participation in this investigation and through information I have learned from members of the FAA, I have learned that aircraft do not have titles in the same manner as other assets, such as automobiles. Instead, I have come to learn that proof of ownership for aircraft is accomplished through registration with the FAA. As such, and for reasons discussed in more detail herein, it appears Britton-Harr misled CW-6 and CW-7 and caused them to unintentionally mislead prospective members by telling them, and allowing them to believe, that the LLCs would be able to physically hold the title to their aircraft in escrow, as described in paragraph 2 of the LLC agreements.

### *The Disbursement Instructions and Analysis of Relevant Bank Records*

60.    Records from the escrow agent show that Britton-Harr digitally signed approximately 28 escrow disbursement instructions. Each instruction was digitally countersigned by CW-7. The digital signatures were affixed using Docusign. Each instruction stated that the funds were needed to perform activities consistent with LLC's member agreement. Each disbursement instruction identified the aircraft for which the funds were requested, the amount being disbursed, any applicable fees, and the total disbursements from the LLC to date. In each instruction the signatories affirmed that "Aerovanti and the Member [the LLC] hereby confirm and certify that the Disbursement Amount is in compliance with section 1.d of the Member Agreement."

61.    Signature envelopes obtained from Docusign indicate **TARGET ACCOUNT #2** was associated with Britton-Harr's digital signature on each disbursement instruction. Specifically, the Docusign envelopes all show that Britton-Harr signed the disbursement instructions through links sent to **TARGET ACCOUNT #2**.

62.    As shown in more detail below, the individual disbursement requests never equated to the anticipated cost of the aircraft as stated in the LLC agreements (approximately $3,000,000 per aircraft). Instead, they ranged from approximately $150,000 to $1,650,000. CW-7 explained that Britton-Harr typically contacted him around the time CW-7 received the disbursement instructions. CW-7 claimed that he asked Britton-Harr why the requested funds were in odd amounts and less than the full anticipated purchase price of the aircraft. According to CW-7, Britton-Harr told him (CW-7) this was all that was needed to close on the aircraft. CW-7 relied on Britton-Harr's representations.

### 44Z, LLC Disbursements

63.    The table below sets forth information about the disbursement instructions for 44Z, LLC that Britton-Harr executed using **TARGET ACCOUNT #2**. This information was derived from the disbursement instructions the investigative team obtained from the escrow agent.

| Date | LLC/Aircraft | Amount |
|---|---|---|
| 4/5/2022 | 44Z, LLC./N2444Z | $675,000 (escrow fees withheld) |
| 4/8/2022 | 44Z, LLC./N2444Z | $225,000 |
| 4/12/2022 | 44Z, LLC./N2444Z | $300,000 |
| 4/13/2022 | 44Z, LLC./N2444Z | $450,000 |

| 4/19/2022 | 44Z, LLC./N2444Z | $150,000 |
| 4/21/2022 | 44Z, LLC./N2444Z | $150,000 |
| 4/26/2022 | 44Z, LLC./N2444Z | $150,000 |
| 5/9/2022 | 44Z, LLC./N2444Z | $150,000 (escrow fees withheld) |
| 5/11/2022 | 44Z, LLC./N2444Z | $450,000 |
| 5/13/2022 | 44Z, LLC./N2444Z | $150,000 (escrow fees withheld) |
| | | **Total: $2,850,000** |

64. The investigative case team also obtained records from bank accounts associated with Britton-Harr and Aerovanti. This includes records from First National Bank of Pennsylvania for checking accounts belonging to Aerovanti. The first relevant account ends in x4642 (hereafter "the 4642 account") and the second relevant account ends in x0104 (hereafter "the 0104 account"). Signature cards for these accounts indicate Britton-Harr is an authorized signatory.

65. Each disbursement identified in the table in paragraph 56 was deposited into the x4642 account. A review of the April and May 2022 statements for that account, as well as other relevant bank records, show that none of the disbursed money was used to purchase or refurbish N2444Z.[4] As indicated above, N2444Z was not acquired by Aerovanti and Britton-Harr until

---

[4] On April 6, 2022, there is an outgoing wire of $90,000 to CW-4 and 5's broker business. However, based on law enforcement's interview with CW-4 and 5, I believe that money was intended to satisfy delinquent lease payments from previous months. Moreover, there are additional payments to CW-4 and 5's broker business involving 44Z, LLC funds. These payments were consistent with the agreed upon lease amount of $30,000.

September 2022, by which point all of 44Z, LLC's funds had been spent and misappropriated for unauthorized purposes.

66.     Several transactions involving 44Z, LLC's funds demonstrate Britton-Harr's fraudulent and money laundering activities. By way of example, on or about April 21, 2022, Britton-Harr wired $100,000 from the 4642 account to his wife's personal checking account at Truist Bank ending in 1153.   Analysis of the April and May 2022 statements for that account shows that Britton-Harr's wife used the money to pay for personal and living expenses, including luxury clothing.  I know that a forensic accountant determined that those transactions were conducted using LLC funds based on a tracing analysis.  These expenditures were not authorized under the membership addendum agreement and were never disclosed to CW-7 or the 44Z, LLC. unitholders.

**Additional Misrepresentations by Britton-Harr about N2444Z Involving Target Accounts**

67.     On or about March 31, 2022, Britton-Harr used **TARGET ACCOUNT #2** to send an email to CW-6, CW-7, and De Pol (at **TARGET ACCOUNT #1**). Therein he wrote, *inter alia*, "I spoke with the seller and with the current list of participating members for 44Z, the amount ($825k) of deposits will allow for the title to be released and we can close. We can then allow for a rolling close for the additional participating members to join but this way we have secured the aircraft."

68.     Analysis of the 4642 and 0104 accounts, along with other relevant records, show that the 44Z, LLC funds were not used to purchase that aircraft. As shown above, Aerovanti and Britton-Harr did not purchase N2444Z until September 2022 – roughly six months after this email was sent. Therefore, it appears this email shows that Britton-Harr used **TARGET ACCOUNT #2** to make material misrepresentations regarding the use of 44Z, LLC funds. I

19

further believe that this shows **TARGET ACCOUNT #1** is likely to contain additional evidence of Britton-Harr's fraudulent misrepresentations to Aerovanti's members regarding the use and misappropriation of their money.

## 90BC, LLC. Disbursements

69.    The table below sets forth information about the instructions for 90BC, LLC that Britton-Harr executed using **TARGET ACCOUNT #2**. This information was derived from the disbursement instructions the investigative team obtained from the escrow agent.

| Date | LLC/Aircraft | Amount |
|------|--------------|--------|
| 5/27/2022 | 90BC, LLC./N290BC | $1,650,000 |
| 6/3/2022 | 90BC, LLC./N290BC | $450,000 |
| 6/13/2022 | 90BC, LLC./N290BC | $900,000 (escrow fees withheld) |
| | | **Total: $3,000,000** |

70.    Each disbursement noted in paragraph 68 was deposited by the escrow company into the 4642 account. The May and June 2022 statements for that account, as well as other relevant bank records, do not appear to reflect any payments made to purchase N290BC.[5] As indicated above, N290BC was not purchased by Aerovanti and Britton-Harr until April 2023, well after 90BC, LLC.'s funds had been spent and/or misappropriated for various unauthorized purposes. Furthermore, a lawsuit filed by Lender-1 in Sarasota County, Florida, alleges that

---

[5] In May and June 2022, Britton-Harr made what I believe to be payments due under the already existing lease-purchase agreement with Member Group-2. As stated above, Aerovanti did not acquire N290BC until April 2023, well after the 90BC, LLC. funds had been disbursed and spent.

N290BC was acquired through a $1,500,000 loan made by Lender-1 to Aerovanti rather than through 90BC, LLC's funds. Several transactions involving 90BC, LLC's funds demonstrate Britton-Harr's fraudulent and money laundering activities. By way of example, on or about May 27, 2022, the 4642 account received a $1,650,000 disbursement from the escrow agent on behalf of 90BC, LLC. Before receiving this disbursement, the 4642 account's balance was $69,769.30. On or about that same day, Britton-Harr wired $100,000 to his personal checking account at USAA ending in 5923 (hereafter "the 5923 account"). After receiving that wire into the 5923 account, on or about May 31, 2022, Britton-Harr wired $65,000 to a jeweler in Florida. I know that a forensic accountant determined that those transactions were conducted using LLC funds based on a tracing analysis. These expenditures were not authorized under the membership addendum agreement and were never disclosed to CW-7 or the 90BC, LLC. unitholders.

### N189LW, LLC Disbursements

71. The table below sets forth information about the disbursement instructions for N189LW, LLC that Britton-Harr executed using **TARGET ACCOUNT #2**. This information was derived from the disbursement instructions the investigative team obtained from the escrow agent.

| Date | LLC/Aircraft | Amount |
|---|---|---|
| 6/23/2022 | N189LW, LLC./N189LW | $825,000 |
| 6/30/2022 | N189LW, LLC./N189LW | $375,000 |
| 7/8/2022 | N189LW, LLC./N189LW | $150,000 |
| 7/29/2022 | N189LW, LLC./N189LW | $675,000 (escrow fees withheld) |
| 7/29/2022 | N189LW, LLC./N189LW | $675,000 |

21

| 8/17/2022 | N189LW, LLC./N189LW | $300,000 (escrow fees withheld) |
|---|---|---|
| | | **Total: $3,000,000** |

72.     Each disbursement noted in paragraph 70 was deposited by the escrow company into the 4642 account.  A review of the June, July, and August statements for that account, as well as other relevant bank records, show that none of the money was used to purchase N189LW.[6] As indicated above, neither Aerovanti nor Britton-Harr ever purchased N189LW. Several transactions involving N189LW, LLC's funds demonstrate Britton-Harr's fraudulent and money laundering activities. By way of example, on or about June 24, 2022, the 4642 account received a $825,000 disbursement from the escrow agent on behalf of N189LW, LLC.  On or about June 28, 2022, Britton-Harr wired $25,000 to himself at the 5923 account. Before receiving this wire, the 5923 account's balance was $15,125.46.  On June 29, 2022, after receiving $25,000 from the 4642 account into the 5923 account, Britton-Harr wired $25,000 to BlueWater Yacht Sales. Records from BlueWater Yacht Sales indicated that this $25,000 was a deposit in support of Britton-Harr's purchase of a 47-foot boat.  I know that a forensic accountant determined that those transactions were conducted using LLC funds based on a tracing analysis.  Furthermore, on or about on July 22, 2022, Britton-Harr withdrew $402,953 from the x4642 account and deposited it into a second Aerovanti checking account ending in x0104.  On July 29, 2022, Britton-Harr withdrew $1,060,364 from the x4642 account and deposited it into the x0104 account. These were the first deposits in the x0104 account.  On

---

[6] Throughout 2022, and between June and August, Britton-Harr appeared to make payments due under the already existing lease-purchase agreement with Member Group-1.  As stated above, Aerovanti never acquired N189LW.

22

August 1, 2022, Britton-Harr wired $100,000 from the x0104 account to his personal checking account ending in x5923. Before receiving this wire, the x5923 account had $166,743. The same day, Britton-Harr wired $238,151 to BlueWater Yacht Sales. Records from BlueWater show this wire completed the purchase of a boat. I know that a forensic accountant determined that the previously described transactions involved LLC proceeds based a tracing analysis. None of these transactions were authorized under the membership agreement, nor were they disclosed to CW-7 or any N189LW unitholders.

## N111VR, LLC Disbursements

73.     The table below sets forth information about the disbursement instructions for N111VR, LLC that Britton-Harr executed using **TARGET ACCOUNT #2**. This information was derived from the disbursement instructions the investigative team obtained from the escrow agent.

| Date | LLC/Aircraft | Amount |
|------|--------------|--------|
| 8/17/2022 | N111VR, LLC./N111VR | $675,000 |
| 8/26/2022 | N111VR, LLC./N111VR | $1,275,000 |
| 9/2/2022 | N111VR, LLC./N111VR | $450,000 |
| 9/15/2022 | N111VR, LLC./N111VR | $450,000 (escrow fees withheld) |
| | | **Total: $2,850,000** |

74.     Each disbursement noted in paragraph 72 was deposited by the escrow company into the 4642 account. A review of the August and September statements for that account, as well as other relevant bank records, show that none of the money was used to purchase

N111VR.[7] As indicated above, neither Britton-Harr nor Aerovanti ever purchased N111VR. Several transactions involving N111VR, LLC's funds demonstrate Britton-Harr's fraudulent and money laundering activities. By way of example, on September 16, 2022, Britton-Harr wired $1,000,000 from the x4642 account to the x0104 account. Then on September 20, 2022, Britton-Harr wired $306,000 from the x0104 account to a JPMC account belonging to Triple Lindy, LLC to purchase a racing yacht. Furthermore, on August 31, 2022, Britton-Harr wired $100,000 from the x4642 account to his checking account ending x5923. On September 2, 2022, Mid Atlantic Sports Group ("MASG") cashed a check from the 5923 account for $80,000 for the purchase of a "Brig" boat. I know that a forensic accountant determined that the previously described transactions involved LLC proceeds based a tracing analysis. None of these transactions were authorized under the membership agreement, nor were they disclosed to CW-7 or any N111VR unitholders.

### N1037W, LLC. Disbursements

75.    The table below sets forth information about the disbursement instructions for N1037W, LLC that Britton-Harr executed using **TARGET ACCOUNT #2**. This information was derived from the disbursement instructions the investigative team obtained from the escrow agent.

| Date | LLC/Aircraft | Amount |
|------|--------------|--------|
| 9/8/2022 | N1037W, LLC./N1037W | $450,000 |

---

[7] Throughout 2022, and between August and September, Britton-Harr made what appear to be payments due under the already existing lease-purchase agreement with Member Group-1. As stated above, Aerovanti never acquired N111VR.

24

| 9/15/2022 | N1037W, LLC./N1037W | $950,000 |
|---|---|---|
| 9/22/2022 | N1037W, LLC./N1037W | $300,000 |
| 9/30/2022 | N1037W, LLC./N1037W | $1,200,000 (wire fees withheld) |
| 10/24/2022 | N1037W, LLC./N1037W | $150,000 (escrow fees withheld) |
| | | **Total: $3,050,000** |

76.     Each disbursement noted in paragraph 74 was deposited by the escrow company into the 4642 account. A review of the August, September, and October statements for that account, as well as other relevant bank records, show that none of the money was used to purchase N1037W.[8] As indicated above, neither Britton-Harr nor Aerovanti ever purchased N1037W. Several transactions involving N1037W, LLC's funds demonstrate Britton-Harr's fraudulent and money laundering activities.

77.     For example, on or about October 3, 2022, the 4642 account received a disbursement from the escrow agent for approximately $1,189,776.30 on behalf of N1037W, LLC. Before receiving this disbursement the 4642 account's balance was $9,693.33. On or about October 3, 2022, Britton-Harr wired approximately $400,000 from the 4642 account to the 0104 account. On or about October 4, 2022, Britton-Harr wrote himself a check for $25,000 from the 0104 account, which he deposited into the 5923 account. On or about October 11, 2022, Britton-Harr wrote a check for $30,000 to a Tampa Bay, Florida-based real estate investor to cover rent expenses.

---

[8] Throughout 2022, and between August and October, Britton-Harr made what appear to be payments due under the already existing lease-purchase agreement with Member Group-3. As stated above, Aerovanti never acquired N1037W.

*Conclusion*

78.     Based on the foregoing, I believe there is sufficient evidence to establish probable cause that Britton-Harr engaged in the Target Offenses. Furthermore, I believe there is sufficient evidence to establish probable cause that Britton-Harr used **TARGET ACCOUNTS #2 in** furtherance of those offenses and that evidence of the Target Offenses is likely to be found contained within **TARGET ACCOUNTS #1 and #2.**

## BACKGROUND CONCERNING EMAIL

79.     In my training and experience, I have learned that Microsoft Corporation provides a variety of on-line services, including electronic mail ("email") access, to the public.  Microsoft Corporation allows subscribers to obtain email accounts using their company's name as the domain name, like the email accounts listed in Attachment A.  Subscribers obtain an account by registering with Microsoft Corporation.  During the registration process, Microsoft Corporation asks subscribers to provide basic personal information.  Therefore, the computers of Microsoft Corporation are likely to contain stored electronic communications (including retrieved and unretrieved email for Microsoft Corporation subscribers) and information concerning subscribers and their use of Microsoft Corporation services, such as account access information, email transaction information, and account application information.  In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

80.     A Microsoft Corporation subscriber can also store with the provider files in addition to emails, such as address books, contact or buddy lists, calendar data, pictures (other than ones attached to emails), and other files, on servers maintained and/or owned by Microsoft Corporation. In my training and experience, evidence of who was using an email account may be

26

found in address books, contact or buddy lists, email in the account, and attachments to emails, including pictures and files.

81.    In my training and experience, email providers generally ask their subscribers to provide certain personal identifying information when registering for an email account. Such information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative email addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number). In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users. Based on my training and my experience, I know that, even if subscribers insert false information to conceal their identity, this information often provides clues to their identity, location, or illicit activities.

82.    In my training and experience, email providers typically retain certain transactional information about the creation and use of each account on their systems. This information can include the date on which the account was created, the length of service, records of log-in (*i.e.*, session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account. In addition, email providers often have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the email account.

27

83.     In my training and experience, in some cases, email account users will communicate directly with an email service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. Email providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

84.     As explained herein, information stored in connection with an email account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, the information stored in connection with an email account can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, email communications, contacts lists, and images sent (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the account at a relevant time. Further, information maintained by the email provider can show how and when the account was accessed or used. For example, as described below, email providers typically log the Internet Protocol (IP) addresses from which users access the email account, along with the time and date of that access. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the email account access and use relating to the crime under investigation. This geographic and timeline

28

information may tend to either inculpate or exculpate the account owner. Additionally, information stored at the user's account may further indicate the geographic location of the account user at a particular time (*e.g.*, location information integrated into an image or video sent via email). Last, stored electronic data may provide relevant insight into the email account owner's state of mind as it relates to the offense under investigation. For example, information in the email account may indicate the owner's motive and intent to commit a crime (*e.g.*, communications relating to the crime), or consciousness of guilt (*e.g.*, deleting communications in an effort to conceal them from law enforcement).

## CONCLUSION

85.　Based on the foregoing, I request that the Court issue the proposed search warrant.

86.　Because the warrant for the requested data from **Target Account #1** and **Target Account #2** is stored on an electronic media device already in the government's possession, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

Respectfully submitted,

Charles Bradford
Special Agent
U.S. Department of Transportation – Office of
Inspector General

Affidavit submitted by email and attested to me as true and accurate by telephone consistent with Fed. R. Crim. P. 4.1 and 41(d)(3 this ___5___ day of March 2026.



29



1:26-mj-00554-ADC

Honorable A. David Copperthite
UNITED STATES MAGISTRATE JUDGE

1:26-mj-00554-ADC

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with rdepol@aerovanti.com (**TARGET ACCOUNT #1**) and pbh@aerovanti.com (**TARGET ACCOUNT #2**) that is stored on an electronic media device in the custody of the United States in the District of Maryland.

_____ FILED _____ ENTERED
_____ LOGGED _____ RECEIVED

MAR 3 1 2026

AT BALTIMORE
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _____ DEPUTY

1:26-mj-00554-ADC

_____ FILED_____ ENTERED
_____ LOGGED_____ RECEIVED

MAR 3 1 2026

AT BALTIMORE
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY_____ DEPUTY



## ATTACHMENT B

**Information to be seized by the Government**

All information contained in the device described in Attachment A that constitutes fruits, contraband, evidence, and instrumentalities of violations of 18 U.S.C. §§ 1343 (wire fraud), 1956 (money laundering), and 1957 (money laundering), those violations involving **Patrick Tormay Britton-Harr,** and occurring after **October 1, 2021,** including information pertaining to the following matters:

(a) Communications between Britton-Harr and De Pol; communications between Britton-Harr, De Pol, and other employees of Aerovanti; communications between Britton-Harr and/or De Pol and all existing and prospective members and customers of Aerovanti; communications between Britton-Harr and/or De Pol and employees and officers of Gilchrist Aviation Law and Escrow; communications between Britton-Harr and/or De Pol and the owners of any aircraft; communications related to the transfer of Aerovanti customer funds; communications related to the purchase of any boats or yachts; communications related to the purchase of any real estate;

(b) Evidence indicating how and when the email account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the email account owner;

(c) Evidence indicating the email account owner's state of mind as it relates to the crime under investigation;

(d) The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).

2

(e) The identity of the person(s) who communicated with the user ID about matters relating to the transfer of Aerovanti customer funds, the acquisition of aircraft, the acquisition of watercraft, the acquisition of real estate, the transfer of funds between accounts, the concealment of ownership of aircraft; including records that help reveal their whereabouts.

This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, a complete copy of the disclosed electronic data may be delivered to the custody and control of attorneys for the government and their support staff for their independent review.

## III.    Search Procedures for Handling Potentially Privileged Information

1.     The following procedures will be followed at the time of the search in order to appropriately handle potentially privileged information (material that may potentially be protected by the attorney-client privilege, the attorney work product doctrine, or other recognized privilege or protection).

2.     These procedures will be executed by: (a) law enforcement personnel conducting the investigation and search and other individuals assisting law enforcement personnel in the search, including any prosecutor participating in these investigation (the "Search Team") (b) the Special Matters Unit ("SMU") of the Criminal Division, Fraud Section. SMU attorneys and

3

support staff are not and will not become part of the prosecution team and have a separate reporting chain from the prosecution team.

3.      With respect to the search of the information provided pursuant to this warrant, law enforcement personnel will make reasonable efforts to use methods and procedures that will locate and expose those categories of files, documents, communications, or other electronically stored information that are identified with particularity in the warrant while minimizing the review of information not within the list of items to be seized as set forth herein, to the extent reasonably practicable. If the government identifies any seized communications that may implicate the attorney-client privilege, law enforcement personnel will discontinue its review and take appropriate steps to segregate all potentially privileged information so as to protect it from substantive review. The investigative team will take no further steps regarding any review of information so segregated absent further order of the court. The investigative team may continue to review any information not segregated as potentially privileged.

4